**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**

_____

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| LATEX FOAM INTERNATIONAL, LLC, | : Case No. 19-51064 |
| LATEX FOAM INTERNATIONAL HOLDINGS, INC., | : Case No. 19-51065 |
| LATEX FOAM ASSETS ACQUISITION, LLC, | : Case No. 19-51066 |
| PURELATEX BLISS, LLC, and | : Case No. 19-51067 |
| PLB HOLDINGS, LLC, | : Case No. 19-51068 |
| | : (Jointly Administered Under |
| Debtors. | : Case No. 19-51064) |

_____

**MEMORANDUM OF DECISION AND ORDER**
**ON MOTION FOR AUTHORITY FOR CONTINUED USE OF**
**CASH COLLATERAL AND TO PROVIDE ADEQUATE PROTECTION**

Julie A. Manning, Chief United States Bankruptcy Judge

## I.   INTRODUCTION

On August 8, 2019, Latex Foam International, LLC, Latex Foam International Holdings, Inc., PLB Holdings, LLC, PureLatex Bliss, LLC, and Latex Foam Assets Acquisition, LLC (the "Debtors") filed voluntary petitions for the relief under Chapter 11 of the Bankruptcy Code.  On that same date, the Debtors filed a Motion to Use Cash Collateral and To Provide Adequate Protection (the "Motion" ECF No. 4).  On August 14, 2019, a preliminary order entered authorizing the Debtors' use of cash collateral and providing adequate protection.  Additional interim orders entered authorizing the Debtors' use of cash collateral and providing adequate protection for a specific period of time.  Before the specific period of time authorizing the continued use of cash collateral expired, the Debtors were required to file a subsequent proposed order authorizing the continued use of cash collateral for a future period of time to allow parties an opportunity to file an objection to the proposed order.

The operative interim order is the Eighth Interim Order Authorizing the Use of Cash Collateral and Providing Adequate Protection, which entered on March 26, 2020 (the "Eighth Interim Order," ECF No. 498). The Eighth Interim Order authorized the use of cash collateral through May 2, 2020. In accordance with the provisions of the Eighth Interim Order, on April 22, 2020, the Debtors filed a proposed Ninth Interim Order authorizing the use of cash collateral through May 30, 2020 (the "Ninth Interim Order," ECF No. 510). On April 27, 2020, Entrepreneur Growth Capital, LLC ("EGC"), a secured creditor and party-in-interest, filed an Objection to the Ninth Interim Order (the "Objection"). ECF No. 516. The Official Committee of Unsecured Creditors (the "Committee") filed a Response to the Ninth Interim Order on April 27, 2020 (the "Response"). ECF No. 517.

An evidentiary hearing on the Motion and the Ninth Interim Order was held on May 1, 2020. The parties agreed to the full admission of nine exhibits and the Debtor called one witness in support of the Motion and the Ninth Interim Order. At the conclusion of the hearing, the matter was taken under advisement. For the reasons that follow, the Motion is granted and the Debtors are authorized to continue to use cash collateral through May 30, 2020, and to provide adequate protection to EGC in accordance with the provisions of the Ninth Interim Order.

## II.   <u>JURISDICTION</u>

The United States District Court for the District of Connecticut has jurisdiction over the instant proceedings pursuant to 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to hear and determine this matter pursuant to 28 U.S.C. §§ 157(b)(1), (b)(2)(A) and (b)(3) and the District Court's General Order of Reference dated September 21, 1984.

III.    **FACTS**[1]

1.      The Debtors filed the instant Chapter 11 cases on August 8, 2019.

2.      In accordance with 11 U.S.C. §§ 1107 and 1108, the Debtors continue in possession of their properties and continue to operate and manage their businesses as debtors-in-possession.

3.      As of the Petition Date, EGC has asserted a first priority secured claim of $9,342,934.33 against all of the Debtors' assets, including the Debtors' cash, inventory, and accounts receivable.  *See* Exhibit EGC-1.

4.      The Debtors have acknowledged the extent, validity, and priority of the liens of ECG, and have waived any defenses, challenges, disputes, or counterclaims to the same.  *See, e.g.*, Eighth Interim Order.

5.      At the time the Debtors filed the Chapter 11 cases, the aggregate amount of cash, accounts receivable, and inventory exceeded the amount of EGC's claim.  EGC had a lien on machinery and equipment owned by the Debtors.  *See* Exhibits EGC-1 and ECG-2.

6.      The Court entered a Preliminary Order Authorizing Use of Cash Collateral and Providing Adequate Protection on August 14, 2019, authorizing the Debtors to use cash collateral through and including August 27, 2019.  On March 26, 2020, the Eighth Interim Order entered authorizing the Debtors to use cash collateral through and including May 2, 2020.  The interim orders authorizing the use of cash collateral and providing adequate protection, ECF Nos. 48, 79, 175, 235, 272,404, 455, 498, are hereafter referred to as the "Interim Cash Collateral Orders."

---

[1] The facts are established by (1) the eight Interim Orders Authorizing Use of Cash Collateral and Providing Adequation Protection; (2) the Motion, the Objection, and the Response; and (3) the testimony and the exhibits admitted at the hearing, unless otherwise indicated.

7.       Pursuant to the terms of the Interim Cash Collateral Orders, in exchange for the interim use of cash collateral by the Debtors and as adequate protection for EGC's interests therein, EGC was granted replacement and/or substitute liens (subject only to certain carve-outs) as provided by 11 U.S.C. § 361(2) in all post-petition assets of the Debtors and proceeds thereof, excluding any bankruptcy avoidance causes of action.  The Interim Cash Collateral Orders further provided that the "replacement liens shall have the same validity, extent, and priority that EGC possessed as to said liens on the Petition Date; provided, however, that such replacement liens shall only be for the amount of any diminution of value in EGC's cash collateral."

8.       The Interim Cash Collateral Orders also:  (i) allowed "the Debtors to use accounts receivable which constitute cash collateral of EGC on a revolving basis and to provide EGC with replacement liens upon post-petition assets to the extent that EGC held valid liens as of the Petition Date, so that its interests therein will not be diminished during the interim period covered by the term of this Order;" and (ii) provided that EGC "is entitled to the benefits of §507(b) of the Code (subject only to the carve-outs in paragraphs 5k and 5l of this Order)."

9.       On April 22, 2020, the Debtors filed the Ninth Interim Order.

10.      On April 27, 2020, EGC filed its Objection, seeking to have the Motion and the Ninth Interim Order denied in its entirety.  In support of its Objection, EGC asserts the following:

     a.   The Debtors are no longer in operation.

     b.   The Debtors' financial position is declining.  They generated a negative cash flow in April 2020.

     c.   Despite over five months of searching for a buyer of the Debtors' business, a buyer has not been located willing to pay sums sufficient to satisfy EGC's claim.

    d.   Administrative expenses continue to accrue.

    e.   The Debtors cannot provide adequate protection of EGC's lien.

11.    The Committee filed its Response on April 27, 2020.  The response sets forth the following:

    a.   While the Committee has concerns about the Debtors' failure to propose a plan, or complete a sale process yet, it believes the Debtors are close to entering into a stalking horse agreement for the sale of the Debtors' business.

    b.   Denying use of cash collateral will eliminate any chance of recovery for unsecured creditors.

12.    During the evidentiary hearing on the Motion and the Ninth Interim Order held on May 1, 2020, the Debtors' Chief Financial Officer, Mr. Steve Turner, testified to the following:

    a.   He graduated from the University of Kent with an accounting degree and has over 30 years of experience as an accountant.

    b.   He began working for the Debtors as Vice President of Finance in 2014 and became the Chief Financial Officer within one year.

    c.   As the Debtors' Chief Financial Officer, his responsibilities include financial reporting, auditing, management reporting, financial evaluations, and risk management.

    d.   He has direct knowledge of financial reports produced by the Debtors, including information in reports provided to insurance companies to obtain to insurance coverage for the Debtors' assets.

    e.   The Debtors' borrowing base Collateral Calculation Report dated as of August 23, 2019, two weeks after the Debtors' Chapter 11 cases were filed (the "August 23,

2019 Collateral Calculation Report") lists, among other things, Cash on Hand as $3,610,156.30, Eligible Inventory as $1, 976,791.26, and Eligible Accounts Receivable as $4,111,764.69, when added together equals $9,698,712.25. *See* Exhibit EGC-4.

f.  The Debtors' borrowing base Collateral Calculation Report dated as of April 24, 2020 (the "April 24, 2020 Collateral Calculation Report"), lists, among other things, Cash on Hand as $3,517,049.53, Eligible Inventory as $2,565,012.54, and Eligible Accounts Receivable as $2,979,429.08, when added together equals $9,061,491.15. *See* Exhibit ECG-7.

g.  Approximately $200,000.00 in rebates to customers should be subtracted from the Cash on Hand figure in the April 24, 2020 Collateral Calculation Report.

h.  A comparison of the August 23, 2019 Collateral Calculation Report and the April 24, 2020 Collateral Calculation Report show that, during the pendency of the Debtor's bankruptcy case, the decline in value of assets was approximately $400,000.00.

i.   During the pendency of the case, the Debtors made approximately $800,000.00 in adequate protection payments to EGC.

j.  The Debtors have not ceased their operations, but have been operating with a reduced staff for several weeks.

k.  Based on the history of the business, he expects that the Debtors will actually collect $3,400,000.00 of the gross accounts receivable as long as the Debtors remain operational.

l. Approximately 80% of the Debtor's gross inventory is finished goods to be sold to customers. Based on his experience and knowledge, the inventory of finished goods would realize more value than the inventory value, and that the total value of gross inventory is $2,500,000.00.

m. Since 2018, the Debtors have spent between $1,500,000.00 and $1,800,000.00 on the purchase of new machinery and equipment.

n. Based on his personal knowledge and experience, the minimum value of the Debtor's machinery and equipment is $2,000,000.00 to $2,500,000.00.

o. The Debtors' proposed budget for May 2020 shows proposed operating expenses of $1,015,000.00 and cash receipts of approximately $900,000.00, which would result in a deficiency of approximately $115,000.00. *See* Exhibit EGC-6.

p. The Debtors project to make $250,000.00 in sales in May 2020. The Debtor's inventory will also increase in value by $350,000.00 in May 2020. *See* Debtors' Exhibit 2.

q. Throughout the case, the Debtors have outperformed their projections. In the last interim cash collateral period, the Debtors forecasted that they would collect $1,200,000.00 in cash but collected double that amount.

13. During the hearing, Mr. Turner was asked about his opinion of the value of the Debtors' machinery and equipment ("M&E"), which is also subject to EGC's lien. EGC objected to the question on the ground that Mr. Turner was not qualified as an expert witness to provide an opinion of the value of the M&E and could only provide such an opinion, if at all, as a lay person.

7

14.     In response to EGC's objection, the Debtors argued that under Federal Rule of Evidence 702, Mr. Turner could testify as to the value of the M&E and cited certain cases in support of this argument.  When the Court noted that Federal Rule of Evidence 702 applies only to expert witnesses, the Debtors argued that Mr. Turner could testify as to the value of the M&E under Federal Rule of Evidence 701.  In response, EGC continued to assert that Mr. Turner could not testify as to the value of the M&E under any circumstances.  Because the parties agreed that the hearing could continue without the need for the Court to rule on the pending objection to the question, the Court took the evidentiary issue under advisement.  The Court's ruling on this issue is included in the discussion below.

## IV.    <u>DISCUSSION</u>

11 U.S.C. § 363(a) defines cash collateral as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest."   The use of cash collateral is governed by section 363(c)(2) which provides, in relevant part, as follows:

> The trustee may not use, sell or lease cash collateral ... unless—
> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use ... in accordance with
> the provisions of this section.

11 U.S.C. § 363(c)(2).  Section 363(c)(e) goes on to provide that, "on request of an entity that has an interest in property," the Court "shall prohibit or condition such use [of cash collateral] as is necessary to provide adequate protection of such interest."   11 U.S.C. § 363(e).

While adequate protection is not defined in the Bankruptcy Code, section 361 provides three non-exclusive methods as examples of it: "(1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the indubitable equivalent of the secured creditor's interest."  *In re GVM, Inc.*, 605 B.R. 315, 324-25 (Bankr. M.D. Pa. 2019) (citing 11

U.S.C. § 361.).  In any hearing held under section 363, "[i]t is well settled that the debtor bears

the burden to demonstrate that a creditor is adequately protected." *See In re S. Side House, LLC*,

474 B.R. 391, 408 (Bankr. E.D.N.Y. 2012); *see also* 11 U.S.C. § 363(p); *In re Constable Plaza*

*Assocs., L.P.*, 125 B.R. 98, 104 (Bankr. S.D.N.Y. 1991) ("The debtor has the burden of

demonstrating that the creditor will be adequately protected if it is authorized to use the cash

collateral.").  "Whether a creditor is adequately protected depends on the facts and circumstances

of the case." *S. Side House*, 474 B.R. at 408.

> In the context of a request for authorization to use cash collateral under section
> 363(c)(2), it is unlikely that the creditor will be able to receive the precise
> equivalent of cash collateral. However, section 363 does not require precise
> equivalency. The special treatment afforded cash collateral recognizes its unique
> status as the highest and best form of collateral but also establishes that upon an
> appropriate showing it can be used if the rights of the secured creditor can be
> adequately protected. Whether adequate protection may be said to exist will
> depend on a number of factors, including the value of all collateral, the nature of
> the proposed use and the value of that which is being offered. While cases are
> quite varied, substitute liens, equity cushions and operating controls have all been
> found sufficient.

3 Collier on Bankruptcy ¶ 363.05[3], at 363–42 (Alan N. Resnick & Henry J. Sommer eds., 16th

ed. 2020).

The Debtors and EGC presented evidence during the hearing, including lengthy

testimony from Mr. Turner on both direct examination and cross examination.  The only

evidentiary issue that was not ruled on during the hearing was EGC's objection to Mr. Turner's

opinion of the value of the M&E.  Because Mr. Turner was not qualified as an expert witness,

the Court ruled that Federal Rule of Evidence 702 did not apply and therefore the case law cited

by the Debtors addressing Rule 702 is inapplicable.  The issue that the Court must rule on is

whether Mr. Turner can provide opinion testimony of the value of the M&E under Federal Rule

of Evidence 701.

Federal Rule of Evidence 701 provides that a lay witness may provide opinion testimony where such opinion testimony is:

    (a)  rationally based on the witness's perception;
    (b)  helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
    (c)  not based on scientific, technical, or other specialized knowledge within the scope of Fed. R. Evid. 702.

Federal Rule of Evidence 701(a) codifies the "familiar requirement of first-hand knowledge or observation." *See* FED. R. EVID. 701 advisory committee's notes to proposed rules. Most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See* FED. R. EVID. 701 advisory committee's notes to 2000 amendments. Such opinion testimony is admitted not because of experience, training, or specialized knowledge within the realm of an expert, but because of the knowledge that the witness has by virtue of his or her position in the business. *See id.*

Mr. Turner's testimony demonstrates that he has personal knowledge to form an opinion as to the value of the M&E by virtue of his position as the Debtors' Chief Financial Officer. Mr. Turner testified that in his role as Chief Financial Officer, he provides valuations of the M&E to be included in business financial statements and for insurance purposes. Mr. Turner also testified that he is familiar with the value of the M&E because of his involvement with the purchase of a gluing machine that cost between $150,000.00 and $200,000.00 and a number of molds for fabrication of latex foam mattresses that cost $300,000. The Court therefore finds that based on Mr. Turner's personal knowledge, his opinion of the value of the M&E is admissible under Federal Rule of Evidence 701. *See e.g. Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995) (holding a president of a company has personal knowledge of his business to sufficient to testify to calculation of lost profits under Rule 701).

10

After determining that Mr. Turner's testimony regarding the value of the M&E is admissible, the Court now turns to whether, under the facts and circumstances of the Debtors cases established during the hearing on the Motion and the Ninth Interim Order, EGC is adequately protected.  The Court concludes that it is.

EGC's Proof of Claim lists the debt owed to it by the Debtors as $9,342,934.33.  The sum of the Debtors' cash on hand, eligible inventory, and eligible accounts receivable, minus rebates, amounts to $9,061,291.15.  Mr. Turner opined that the minimum value of the machinery and equipment is $2,000,000.00 to $2,500,000.00.  Even without finding an exact dollar amount of the value of the M&E, in is undisputed that the M&E has *some* value.[2]  Further, it is undisputed that, during the pendency of this case, the Debtors have provided EGC with adequate protection payments of approximately $800,000.00.  Therefore, the Court finds the Debtors have met their burden of showing EGC is adequately protected.

The inquiry does not, however, end with the finding that EGC is adequately protected at this point in time.  The Court must also consider whether the value of the Debtors' assets will decline between now and the May 30, 2020, such that ECG is no longer adequately protected.  The evidence establishes that the Debtors' proposed budget for May 2020 shows operating expenses of $1,015,000.00 and cash receipts of $900,000.00.  As Mr. Turner testified, this would result in a deficit of $115,000.00 for the month of May.  Despite a projected deficit for the month of May, there is an equity cushion such that EGC will remain adequately protected.  As set forth above, the amount of cash on hand, eligible inventory, and eligible accounts receivable in the April 24, 2020 Collateral Calculation Report totals $9,061,291.15.  Subtracting from that figure

---

[2] The Debtors' Schedule A, filed under penalty of perjury, provides a *liquidation value* of the machinery and equipment of $2,360,000.00.  *See* ECF No. 99.  (emphasis added).

the rebates dues to customers, accounting for some value for the machinery and equipment, and considering that ECG received approximately $800,000.00 in adequate protection payments, there is an equity cushion sufficient to adequately protect EGC's interest for the month of May, 2020.  Further, Mr. Turner testified that, despite the projected deficit for May, he believes the value of the Debtors' inventory will increase by $350,000.00 if the Debtors remain operational in May.  Therefore, the Court concludes that ECG's interest is adequately protected and that that protection will not erode between now and May 30, 2020.  *See In re Lafayette Hotel P'ship*, 227 B.R. 445, 453 (S.D.N.Y. 1998), *aff'd,* 198 F.3d 234 (2d Cir. 1999) (finding adequate protection for debtor to use cash collateral to fund administrative expenses when there was a sufficient equity cushion to support the creditor's secured and cash collateral claims). !!

## V.    <u>CONCLUSION</u>

For the reasons set forth above, under the facts and circumstances of this case, the Debtors have met their burden of showing that ECG's interest in its collateral is adequately protected and that that protection will not diminish through May 30, 2020.  Therefore, the Debtor's Motion is granted and the Ninth Interim Order shall enter.


Dated at Bridgeport, Connecticut this 4th day of May, 2020.

*Julie A. Manning*
Chief United States Bankruptcy Judge
District of Connecticut